(No. 3395—

CHARLES NEAL, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed January 13, 1942.*

H. OGDEN BRAINARD, for claimant.

GEORGE F. BARRETT, Attorney General; GLENN A. TREVOR, Assistant Attorney General, for respondent.

FISHER, J.

The claimant, Charles Neal, was employed as a truck driver by the State of Illinois, Department of Public Works and Buildings, Division of Highways, Unit "D," building the Lincoln Highway which runs southwesterly out of Charleston, and while so employed on September 2, 1938 shortly after reporting for work, while walking down the highway toward his truck intending to get into it in the performance of his duties he was struck from behind by another truck, knocked down and run over, suffering a fracture of his right shoulder, a fracture of the pelvis and a compound fracture of the left foot. Claimant was taken immediately to the Oakwood Hospital in Charleston and placed under the care of Dr. J. R. Alexander, who reported his injuries as follows:

"Fractures: Right iliac crest, impacted fracture right femur, right clavicle, second, third, fourth and fifth metatarsal bones left foot. Bruised right knee."

Thereafter, on September 6th, claimant was transported to St. Luke's Hospital in Chicago, where he was placed under the care of Dr. H. B. Thomas, Professor of Orthopedics at the University of Illinois Medical College. He remained there until October 18th when he was discharged and registered at the Y. M. C. A. Hotel, continuing his treatments under the direction of Dr. Thomas. On November 5th he was sent to his home where he remained until November 28th, when he again returned to Chicago for the purpose of additional treatment. He again went home on December 20th and returned to Chicago on January 9, 1939 and was treated until January

28th, when he returned home. On February 3, 1939 Dr. Thomas reported to the Division of Highways as follows:

"Has a healed fracture over the distal end of the right clavicle with the following range of motion in the right shoulder: Rotation practically normal, elevation either from abduction or forward flexion lacks about 15 degrees of being complete as fellow.

"A healed fracture of the anterior crest of right ilium, the fragment being displaced downward enough to block flexion of this hip at 110 degrees.

"The metatarsal fractures have healed nicely, the X-ray evidence of acute bone atrophy is diminishing and the patient's complaint of the foot is diminishing. Pre and supination of the foot, inversion and eversion of the heel, flexion and extension of toes are 80% of normal, the circumference of the right calf ⅜" and thigh ¾" less than their fellow.

"Loss of motion at hip joint to pelvis but he can't bring it up to his abdomen—that part of the arc not used much. He can sit comfortably with the thigh at right angles to the pelvis and he can raise the thigh even more until there is only about 45 degrees between the thigh and body.

"I would expect the disability of the foot to disappear completely if he keeps using it. The disability about the right hip will be permanent and I would estimate it at about 15%."

This claim is filed for the benefits of the Workmen's Compensation Act as the same is applicable to State employees. As the record shows that the State had immediate notice of his accident and that the claimant was paid for temporary total disability compensation up to February 5, 1939, which said payment constituted a waiver of notice of claim for compensation within six months, and his claim was filed on July 10, 1939, within one year of the date of the accident, we find that this court has jurisdiction.

"The construction and maintenance of a hard-surfaced public highway is the maintenance and construction of a structure under the Workmen's Compensation Act."

Manhart vs. State, 8 C. C. R., 356 (357).

City of Rock Island vs. Ind. Com., 287 Ill. 76 (79).

and this court is of the opinion that his work was of such a hazardous nature that he is entitled to recovery under the Workmen's Compensation Act. The evidence also plainly shows that the claimant suffered his injuries in the course of his employment and out of his said employment.

The claimant was 57 years of age, married, residing with his wife, and had no children under the age of 16 years dependent upon him for support. The State of Illinois paid him the sum of One Hundred Sixty-six and 07/100 Dollars ($166.07) for the temporary total disability compensation and also paid out the sum of Eight Hundred Sixty-seven and

58/100 Dollars ($867.58) for doctor, hospital and treatment expense. The claimant, by his complaint, alleges there is due him the sum of Four Thousand Dollars ($4,000.00) less the One Hundred Sixty-six and 07/100 Dollars ($166.07) paid for temporary total disability compensation, leaving a balance due him of Three Thousand Eight Hundred Thirty-three and 93/100 Dollars ($3,833.93) plus Three Hundred Twenty Dollars ($320.00) pension per year for life.

In deciding the amount of compensation to which claimant is entitled, the court must determine

*First:*

For what period and at what weekly rate payment shall be allowed for temporary total disability;

*Second:*

Is he entitled to recover for permanent partial disability under paragraph (d), Section (8) of the Workmen's Compensation Act; or

*Third:*

Is he entitled to recover for permanent partial loss of the use of his arm, leg and foot under sub-paragraph (17), paragraph (e) Section (8) of the Workmen's Compensation Act.

In determining the rate of compensation, we note from the evidence that the claimant was employed on August 12, 1938 and was injured on September 2, 1938, a period of less than one month. He worked fifteen (15) days during this period averaging about seven (7) hours per day for which he was paid $.50 an hour up to August 23, 1938 and $.60 an hour thereafter, earning total wages during his employment of Fifty-eight and 40/100 Dollars ($58.40). Claimant alleges he was being paid $.60 an hour and worked an average of seven (7) hours a day. From the evidence submitted by the Division of Highways, truck drivers employed similarly to the claimant work less than two hundred (200) days a year, which evidence was not disputed. This court is of the opinion that the rate should be determined under Section (10), paragraphs (c), (e) and (i) of the Workmen's Compensation Act, which reads as follows:

"The basis for computing the compensation provided for in sections (7) and (8) of the Act shall be as follows:

"(c) If the injured person has not been engaged in the employment of the same employer for the full year immediately preceding the accident, the compensation shall be computed according to the annual earnings which persons of the same class in the same employment and same location, (or if that be impracticable, of neighboring employments of the same kind) have earned during such period.

"(e) As to employees in employments in which it is the custom to operate for a part of the whole number of working days in each year, such number, if the annual earnings are not otherwise determinable, shall be used instead of 300 as a basis for computing the annual earnings; *Provided*, the minimum number of days which shall be so used for the basis of the year's work shall not be less than 200.

"(i) To determine the amount of compensation for each installment period, the amount per annum shall be ascertained pursuant thereto, and such amount divided by the number of installment periods per annum."

In applying the above to the evidence it is apparent his earnings should be computed at $.60 an hour, seven (7) hours per day, which would be Four and 20/100 Dollars ($4.20) per day for two hundred (200) days, or Eight Hundred Forty Dollars ($840.00) per year. This would make his average weekly wage Sixteen and 15/100 Dollars ($16.15). Since the claimant had no children under the age of 16 years at the time of the injury the complete weekly rate would be Eight and 08/100 Dollars ($8.08) per week for temporary total disability. There is, however, conflict in the evidence with respect to the period of time for claimant's temporary total disability. Dr. John R. Alexander who examined claimant on October 24, 1939 testified:

"Mr. Neal must use a cane when he walks and has much difficulty in getting up out of a chair, and because of his injuries to his shoulder and hip, mainly his hip, I am of the opinion that he will never be able to hold down a gainful occupation by which he can make a living and especially that he will never be able to work at a job where he has any walking or lifting to do."

Mr. Neal, claimant herein, testified that he has not earned a penny since he was hurt and was supported by his son. He made an admission, however, that he could have begun to do light work on November 15, 1939. Dr. Shaffer testified that he made a manual examination of Mr. Neal on January 20, 1940, and stated:

"It is my opinion that he is not physically fit or able to follow a gainful occupation. He can do light work in a comparatively short time. You can't tell what he might be able to do in the next five or ten years. I think the outlook is favorable."

Dr. Thomas testified:

"He should have been doing light work the first of March, 1939. He could not have driven a truck, but he could have held a flag, ran errands and brought tools and many things. If he had been on his farm, he would have been doing his cows and working around. He can carry one scuttle of coal even in this shape, and I would not be surprised if he could carry one in each hand if nobody was watching him."

Here we have the testimony of two doctors who are evidently of the opinion that claimant was unable to do any work even to a time shortly prior to January 29, 1940, and the other doctor who took care of him and gave him almost all of the treatments, testifying that he should have been able to do light work on March 1, 1939. The claimant himself admits that he could have done light work on November 15, 1939. This court, after taking into consideration all of the evidence and the reasonable inferences arising therefrom, believes that even though there is a possibility claimant might have done light work prior to November 15, 1939, the fact remains that he did no work, and from all the evidence thinks it is reasonable to conclude that he was unable to do so. This court is therefore of the opinion that he is entitled to temporary total disability for the period from September 2, 1938 to November 15, 1939 at the rate of Eight and 08/100 Dollars ($8.08) per week.

With respect to the second question, paragraph (d), Section (8), of the Workmen's Compensation Act provides:

"If, after the injury has been sustained, the employee as a result thereof, becomes partially incapacitated from pursuing his usual and customary line of employment, he shall, *except in the cases covered by the specific schedule set forth in paragraph (e) of this section*, receive compensation, subject to the limitations as to time and maximum amounts fixed in paragraphs (b) and (h) of this section, equal to fifty percentum of the difference between the average amount which he earned before the accident and the average amount which he is earning or is able to earn in some suitable employment or business after the accident."

Counsel for claimant, seeking the application of said paragraph (d), Section (8) in determining the award, cited:

*Scully* vs. *Ind. Comm.*, 284 Ill. 567.
*Peabody Coal Co.* vs. *Ind. Comm.*, 289 Ill. 449.
*Solar-Sturges Manf. Co.* vs. *Ind. Comm.*, 315 Ill. 352.

In quoting paragraph (d), Section (8), we underscored "except in the cases covered by the specific schedule set forth in paragraph (e) of this section."

This court interprets this to mean that if claimant was covered by Section (e) his award would be based on Section (e) and not on paragraph (d), Section (8). When the cases cited by counsel for the claimant were decided by the Supreme Court they were with respect to injuries which occurred prior to July 1, 1917. Up to that time Section (e) of the Workmen's Compensation Act only covered injuries for the com-

plete loss of a leg, arm, etc., but on July 1, 1917 an amendment went into effect known as sub-paragraph (17), which reads:

"For permanent partial loss of use of a member or sight of an eye, but not including the hearing of an ear, fifty per centum of the average weekly wage during the proportion of the number of weeks in the foregoing schedule provided for the loss of such member or sight of an eye which the partial loss of use thereof bears to the total loss of use of such member or sight of eye."

Section (e) as amended by sub-paragraph (17) now provides for permanent partial loss of members of the body. When the above cases were decided, it did not, and consequently the Supreme Court applied paragraph (d) of Section (8). Now that it does cover such injuries this court is of the opinion from a careful reading of paragraph (d) of Section (8) that if the injuries in question are covered by Section (e), Section (e) should be applied. In this case the claimant claims permanent partial injuries to his shoulder, hip and foot, and as we interpret the statute this is exactly what sub-paragraph (17) of Section (e) covers. This court does not think from the evidence that claimant has a permanent partial back injury and for that reason does not think the questions raised by *Solar-Sturges Mfg. Co.* vs. *Ind. Comm.* supra, apply. If claimant's injury was to the head, neck or back, then undoubtedly paragraph (d) of Section (8) would apply.

There still remains for this court to decide the percentum of permanent partial disability to the shoulder, hip and foot of the claimant. On that point there is considerable difference of opinion by the doctors testifying in this case. Dr. John R. Alexander testified on January 20, 1940 that he was the same person who treated Charles Neal immediately after his injury on September 2, 1938, and that on October 24, 1939 he again examined Charles Neal and found the following:

"He had a healed fracture of the right clavical near the distal end. Speaking of his arm and shoulder motions, rotation of arms practically normal. He is unable to abduct the arm above the shoulder, and when he does abduct it to his shoulder level and tries to go ahead it is impossible due to the pain he has. An ordinary person can get their arm 33⅓% above the shoulder, and he cannot do that. I would say there is about 30% loss of motion in his right shoulder. He has a healed fracture of the anterior crest of his right ilium. The fragment is displaced downward and prevents total flexion, and abducts while the leg is flexed so there is about a 30% loss of motion in the hip. The four fractures of his left foot, that is the metatarsal bones, have healed very nicely, but he still has about 25% loss of motion in

all his movements of ankle, that is his left ankle. The right thigh is about three-quarters of an inch smaller than his left thigh, that would be due to atrophy from disuse mostly. He complains of an extremely sore spot over the lateral dorsal part of his right ilium. This seems to interfere mostly when he gets up from a sitting position to a standing position. Other than that, no other findings."

## On the same day Dr. H. A. Shaffer testified:

"I examined Mr. Neal on January 20, 1940 and found the following: Healed fracture of the right clavical near the distal end. Can abduct the arm above the shoulder. Pain present over right scapula. Loss of motion of right shoulder about 25%, that is just approximately, I won't say that was exact. Healed fracture of the anterior crest of the right ilium, fragment displaced downward, which prevents the total flexion and abduction while the leg is flexed. Constant pain and soreness in the sacrum and the small of the back. About 25% loss of hip action. Third, healed fracture of the four metatarsal bones of the left foot, about 20% loss of motion in the left foot and ankle. Fourth, right thigh is three-quarters of an inch smaller than the left. Has extreme sore area over the lateral dorsal part of the right ilium and sacrum.

My examination was manual not x-ray. All fractures healed in good opposition except the crest of the ilium which was displaced. There was no shortening of the leg. I found a loss of motion in the right arm only in abduction."

## Dr. H. B. Thomas testified on April 24, 1940 that he examined the claimant on April 16, 17, 18 and 19, 1940 and found as follows:

"The patient should receive 15% disability, 7½% for the right arm and the same for the left foot, added together to make a total of 15%. He has no disability in the hip or back except a feigning. I don't think he has any disability today at all. I think the two joints in the arm and the foot have been hurt and if you hurt a joint, you age it, and if he is a potential arthritic he would have it earlier than he would have, and if he is a potential arthritic I think he should have something for it. Those are the only two joints he has hurt. The hip is not a joint, it is a piece of bone taken out of the flat surface of the ilium.

He could perform the same duties he could ever perform with this exception. He has certain self-produced muscle atrophy that has to be taken care of gradually. He can't use the bone muscles until they are trained, his disability today is all self-inflicted. He has more disability than I have named but I don't think he should have credit for it because he has done it himself—that is the feigning stuff. If I carry my right arm in my pocket all summer and don't use it and then expect to hit a golf ball, I won't hit it.

Some doctor told him he never could shovel coal again but they are just wrong. The doctors down there are delivering babies most of the time and they don't know much about backs. I have tried for four days to persuade myself that he wasn't malingering, but I can't do it. He walks without his cane without apparent difficulty when you are not looking at him. He did a good deal of grunting and bearing down and being very

cautious and got in a cab very stiffly, then he took a notion to look at the advertisements on Michigan Avenue; we opened the door, he forgot himself, and got out very easily with a changed type of action altogether. He didn't use his back much but he had his leg flexed up about 110 degrees getting out of the cab."

Counsel for claimant urges the view that two doctors having testified in substantial agreement, and one doctor testified to a different view, that the preponderance of the evidence is with the claimant and should be followed. It is true that the issues should be decided on the preponderance of the evidence, but this does not necessarily mean a preponderance numerically. It is the court's duty to take into consideration all of the evidence and the reasonable inferences arising therefrom. Dr. Shaffer evidently gave his conclusions from one manual examination of the claimant. Dr. Alexander treated the claimant for a few days when he was first hurt and made an examination on October 24, 1939. Claimant was under the direct treatment and observation of Dr. Thomas from September 6, 1938 to November 5, 1938, November 28, 1938 to December 20, 1938, January 9, 1939 to January 28, 1939, and again examined the claimant on April 16, 17, 18, and 19, 1940. It is apparent that Dr. Thomas had a more intimate knowledge of the claimant's condition. He treated the claimant for a long period of time and was in a position to observe the claimant during this time under all conditions and circumstances. He has an excellent reputation as an orthopedic surgeon and is a Professor of Orthopedics at the University of Illinois Medical College. It was because of his excellence in this kind of practice that the claimant was sent to him for treatment.

In consideration of all the evidence this court is of the opinion that claimant suffered a 7½% disability to his right arm and a 7½% disability to his left foot. In his report to the Division of Highways on February 3, 1939 Dr. Thomas reported:

"The disability about the right hip will be permanent and I would estimate it at about 15%."

Evidently in his opinion, as a result of his examination on April 16, 17, 18 and 19, 1940, this condition had cleared up, as he testified that the claimant had no disability in the hip or back except a feigning.

In considering all of the evidence this court is of the opinion that claimant may still have some hip injury, and find that he has disability of 15% in the use of his right leg.

The court, therefore, upon a consideration of the entire record, finds that the claimant, having suffered an accidental injury which arose out of and in the course of his employment, is entitled to have and receive from the respondent the following sums, to-wit:

(1) Eight and 08/100 Dollars ($8.08) for sixty-two and five-sevenths (62 5/7ths) weeks, that being the period of temporary total disability, or the sum of Five Hundred Six and 73/100 Dollars ($506.73);

(2) The further sum of Eight and 08/100 Dollars ($8.08) per week for 16.875 weeks, to-wit: One Hundred Thirty-six and 35/100 Dollars ($136.35) for the permanent loss of 7½% of the use of his right arm;

(3) The further sum of Eight and 08/100 Dollars ($8.08) per week for 10.125 weeks, to-wit: Eighty-one and 81/100 Dollars ($81.81) for the permanent loss of 7½% of the use of his left foot;

(4) The further sum of Eight and 08/100 Dollars ($8.08) for 28.5 weeks, to-wit: Two Hundred Thirty and 28/100 Dollars ($230.28) for the permanent loss of 15% of the use of his right leg;

(5) Or a total compensation in the amount of Nine Hundred Fifty-five and 17/100 Dollars ($955.17), from which must be deducted the sum of One Hundred Sixty-six and 07/100 Dollars ($166.07) heretofore paid to claimant, leaving a balance of Seven Hundred Eighty-nine and 10/100 Dollars ($789.10).

Award is therefore entered in favor of the claimant for the said sum of Seven Hundred Eighty-nine and 10/100 Dollars ($789.10), which is payable forthwith.

This award being subject to the provisions of an Act entitled "An Act Making an Appropriation to Pay Compensation Claims of State Employees and Providing for the Method of Payment Thereof," approved June 30, 1941, and being by the terms of such Act, subject to the approval of the Governor, is hereby, if and when approval is given, made payable from the appropriation from the Road Fund in the manner provided for in such Act.